# EXHIBIT N

MATTHEW D. CHURCH #15574
**PLANT CHRISTENSEN & KANELL**
136 East South Temple, Suite 1700
Salt Lake City, Utah 84111
(801) 363-7611
mchurch@pckutah.com
*Attorney for Defendants Doyle Peck, Mark Maughan, and Philip Yahne*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| VIKEK LAKHUMNA, <br><br> Plaintiff, <br><br> v. <br><br> SGT. MESSENGER, et. al., <br><br> Defendants. | **LT. DOYLE PECK'S DECLARATION IN SUPPORT OF *MARTINEZ* REPORT** <br><br> Civil Action No. 4:18-Cv-81 DN <br><br> Magistrate Judge David Nuffer |

I, DOYLE PECK, having been duly sworn, under oath, state that the following statements are true and based upon my personal knowledge.

1. I am currently employed by the Cache County Sheriff's Office. I have also worked in various capacities at the Cache County Jail ("the Jail") including as a sergeant and as the Jail Commander. As a sergeant, I was responsible for the supervision and development of jail deputies. I attended multiple trainings specific to jail operations. As a Jail Commander, I went through the Utah Jail Commanders Certification Program that included training in many jail topics including but not limited to: day-to-day jail operations, legal topics, classification topics, grievance processes, etc.

2. I am familiar with Jail incident reports, grievances, and record keeping.

3. I am familiar with Plaintiff Vivek Lakhumna and have read his Fifth Amended Complaint alleging various constitutional violations during his incarceration at the Cache County Jail.

4. The Jail has a comprehensive grievance system where an inmate can raise a grievance about nearly any aspect of their incarceration. Each grievance is reviewed and responded to by the appropriate department.

5. The grievance process with the Cache County Jail provides a system through which inmates can bring issues to the attention of Jail administration which can then be reviewed and (hopefully) remedied. This process includes different levels of review so that an inmate can have more than one staff member involved, thus avoiding the possibility of retaliation by a staff member.

6. The grievance process does place limitations on the amount of time allotted for reviews and filings so that they can be reviewed in a timely manner, helping both the inmate and jail staff to resolve issues as quickly as possible. If these limitations did not exist, the Jail would be inundated with both requests and grievances.

7. The Cache County Jail works to accommodate inmate issues as long as they do not negatively impact the safety, security, general order and discipline of the Jail. As part of this process, the inmates are asked to attempt to remediate any issues with line staff prior to beginning the grievance process. This allows for many issues to be resolved quickly and expeditiously without any formal grievance process.

8. The grievance process also allows the inmate a chance to explain what would, in their view, resolve the situation. Most reasonable requests by inmates that are not contrary to

policy and do not negatively impact the safety, security, general order and discipline of jail operations can be accommodated without the need for the grievance process. This process also allows for a reasonable amount of time for accommodations to be reviewed and possibly made without involving costly litigation.

9. Unless the grievance system is exhausted completely, litigation is not allowed.
10. The grievance policy was available to all inmates and addresses all types of potential harm.
11. At the time of this Complaint, inmate handbooks were available to all inmates through the kiosks that were in each housing block. In addition, inmates were able to check out individual copies of the handbook through the library. Because they were on the kiosks and in the library, we (the staff) were able to ensure that they were up-to-date with the most current information for the inmates. Any inmate who asked how to access these materials provided all relevant information by the jail line staff.
12. In response to Mr. Vivek Lakhumna's Fifth Amended Complaint and the allegations against me, I reviewed his jail records for the time he was incarcerated at the Jail. These records were safely kept and stored by the Jail in the ordinary course of business.
13. Mr. Lakhumna was incarcerated at the Cache County Jail from June 7, 2018 through July 19, 2018.
14. During the short time Mr. Lakhumna was incarcerated at the Cache County Jail he filed multiple grievances and made a series of special requests.
15. If a request form is not specifically marked as a grievance, then it is not handled as a grievance.

16. Accordingly, many of Mr. Lakhumna's "requests" did not rise to the level of actual "grievances," and were therefore did not initiate the grievance process.

17. Nonetheless, in June of 2018, Mr. Lakhumna filed a series of requests and/or grievances requesting specific dietary meals, access to materials to build a prayer alter, and the return of his physical prayer beads.

18. At the time, I was employed by Cache County Jail as the Jail Commander.

19. As the Jail Commander, I was responsible for day-to-day jail operations which included acting as a level of review in the grievance appeals process. I worked daily with the administrative sergeant who would review the majority of grievances and ensured that he was provided necessary information to be able to answer grievances properly.

20. Religious grievances, being of a higher level of importance, were sent to the administrative sergeant for review. I worked with him to ensure that he had the proper research materials at hand to be able to answer religious grievances in a proper manner.

21. At some point while serving as Jail Commander, I was informed that Sgt. Maughan had allegedly denied the Plaintiff physical access to his prayer beads and had refused to provide him with materials to build a prayer alter.

22. Pursuant to Cache County Jail policy and security concerns, I determined that Sgt. Maughan had appropriately denied Mr. Lakhumna personal access to prayer beads and Mr. Lakhumna's request to build a prayer altar in his cell.

23. I also personally responded to Plaintiff and reaffirmed his right to reasonably practice his religion but expressed that it was my job to analyze potential security issues within the Jail.

24. I further explained that certain elements of religious practice may be reasonably restricted when those practices raise safety and security concerns.

25. I specifically explained that the possession of prayer beads for any religion, not just Hinduism, were prohibited in the Jail.

26. I reminded Mr. Lakhumna that he had been provided a picture of his prayer beads to aid him in his religious practice and observance in a manner that did not raise the same safety and security concerns posed by the possession of actual beads.

27. I also explained that the placement or construction of a prayer altar in a cell created safety and security issues and was not permitted.

28. To the best of my knowledge, Mr. Lakhumna did not appeal or otherwise respond to the Sgt. Maughan's denial of both prayer beads and the materials for an altar.

29. Mr. Lakhumna filed another separate request regarding his dietary restrictions, indicating that he needed specific meals conforming to his religious tenets. I responded and asked Plaintiff if he would like to switch to a vegetarian diet. I do not remember ever hearing back regarding this request.

30. Mr. Lakhumna filed another separate grievance on June 18th, 2018 requesting his "legal paperwork."

31. Cache County Jail policy limits and strictly regulates the property which inmates may have in their cells.

32. During the booking process of state inmates, property is generally searched and inventoried.

33. A property matrix that was approved by both the Utah State Prison and the county Jail Commanders allowed booking staff to know what items were acceptable to be retained by the inmate.

34. At the time of Mr. Lakhumna's booking, legal materials were allowed along with the other approved property.

35. Any property that was not on the matrix was stored for the inmate. If the inmate requested additional property that was being stored, it would be reviewed by the property deputy who would make a final determination based on Cache County Jail policy.

36. Acceptable amounts of legal material were allowed to be retained by the inmate after it was reviewed and determined to be legal materials at the time of booking.

37. If the inmate felt that they were not provided all of the necessary legal materials, they could make a request to the property deputy who would review the materials within a reasonable amount of time (usually less than 1 week).

38. Accordingly, although Plaintiff was allowed to have legal materials in his possession, when an inmate makes a request for legal materials, the property department will generally go through those documents to review them and determine what is and is not "legal," in nature. I informed Plaintiff of this process.

39. To the best of my knowledge, Mr. Lakhumna did not respond to this explanation.

40. All line staff who would be accessible to the inmates on a daily basis were also aware of this process and would reiterate to the inmates the process by which they could access materials that they felt they should have been allowed to keep.

41. During this same time period, Plaintiff filed various other grievances and multiple threats to file a lawsuit.

42. As far as I am aware, Mr. Lakhumna eventually received all of his legal paperwork.

43. My general practice in these types of situations is as follows: First, as previously mentioned, legal property is usually reviewed and approved to be kept by the inmate at the booking process. I always made sure that the property deputy had reviewed all of the paperwork and was leaning towards being more forgiving with legal paperwork. When faced with large amounts of legal paperwork, it had been our practice to allow the inmate to go to the property room and separate their paperwork into different files and folders. This would be done under the supervision of the property deputy to ensure that they didn't mix contraband into the legal paperwork or access other inmate's property. They could then request those files and folders and we would take them to them and remove the set of papers that they no longer needed. At times, this was necessary as some inmates would literally have boxes of paperwork and we don't allow that much paperwork in the cells as it can be used to fuel fires, can be made into contraband (we've had paper clubs made that were as hard as a real wooden baton), etc.

44. All of my responses to Mr. Lakhumna's multiple requests and grievances were dictated by and in accordance with the Cache County Jail policy.

45. In this case, the Plaintiff filed multiple grievances and did not give us a chance to respond before he was already filing more. From the beginning, he asked for special privileges that were not given to other inmates and that increased a risk to the safety, security, general order and discipline of the jail.

46. It was apparent that his only intent was to either have us ignore existing policy to get what he wanted OR that he was simply trying to engage in litigation at the outset. He did not give the system a chance to work.

**<u>DECLARATION UNDER PENALTY OF PERJURY</u>**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, that the above sworn statements are true and based upon my personal knowledge and experience.



/s/ Doyle Peck*

Cache County Jail

*An original copy of this signed declaration is available for inspection upon request.

8