THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| VIVEK LAKHUMNA,<br><br>                              Plaintiff,<br><br>            vs.<br><br>SGT. MESSINGER[1] et al.,<br><br>                      Defendants. | **MEMORANDUM DECISION<br>& ORDER GRANTING<br>SUMMARY-JUDGMENT MOTION**<br><br>Case No. 4:18-CV-81 DN<br><br>District Judge David Nuffer |

The parties are currently litigating Plaintiff's verified fifth amended civil-rights complaint (FAC), 42 U.S.C.S. § 1983 (2022). (ECF No. 38.) The remaining defendants and claims are scattered across four correctional facilities, with three summary-judgment motions pending between them. (ECF Nos. 100, 101, 120.)  See also ECF Nos. 38, 43. This Order grants the summary-judgment motion filed jointly by Defendant C. Mark Messinger of Beaver County Jail (BCJ) and Defendant Sharity Schiltz of Uintah County Jail (UCJ). (ECF No. 101.)

**Summary of Claims**

Though these defendants and their individual activities are unrelated to each other, Plaintiff raises the same claims against each of them at their respective institutions:

(1) Violation of Plaintiff's First Amendment right to free exercise of his Hindu religion. (ECF No. 38, at 19.) Specifically, he alleges Defendants Messinger and Schlitz

---

[1] Sgt. Messinger's name has been misspelled since this case was filed. Going forward, his name will be spelled correctly, as "Messinger," not "Messenger." (Summ. J. Mot., ECF No. 101, at 1 n.1.)

separately denied his requests for religious access--e.g., dietary requirements, possession of religious items, and religious services. (*Id.*) And,

(2) violation of Plaintiff's Fourteenth Amendment rights to due process and equal protection. (*Id.* at 20.) Specific to these two defendants, Plaintiff alleges he was "not treated equally in regards to religious meals" and did "not receive responses to his grievances."[2] (*Id.*) For instance, Plaintiff asserts that he was "denied religious meals and items[, w]hile Jewish and Muslim inmates receive Kosher and Halal meals[, a]nd Muslim inmates receive fast meals to observe Ramadan." (*Id.*)

### Overview of Motion

Defendants now move for summary judgment, on four alternative grounds:

(a) their affirmative defense of Plaintiff's failure to exhaust his administrative remedies in their jails' grievance processes;

(b) Plaintiff's failure to state a claim upon which relief may be granted;

(c) based on the undisputed material facts, Defendants did not violate Plaintiff's constitutional rights; or

(d) the protection of their affirmative defense of qualified immunity. (ECF No. 101, at 2.)

---

[2] Grievance processes and therefore answers to grievances are not constitutional rights. *See Boyd v. Werholtz*, 443 F. App'x 331, 332 (10th Cir. 2011) (unpublished) ("[T]here is no independent constitutional right to state administrative grievance procedures.). Perhaps Plaintiff means to say that failure to answer grievances is a due-process violation, which it is not. *See id.* ("Nor does the state's voluntary provision of administrative grievance process create a liberty interest in that process."). Because grievance answers are not a constitutional right, and Plaintiff's other allegations appear to fit only under his equal-protection claim, the Court does not further address due process in this Order.

Defendants' motion relies on the following evidence: affidavits, jail grievance policies, copies of jail records, and copies of Plaintiff's requests and grievances and responses to those requests and grievances. (ECF Nos. 90; 101, 102-04.) Meanwhile, Plaintiff's relevant evidentiary support for this summary-judgment motion stems solely from the verified allegations of the FAC, to which he attached a copy of a single BCJ grievance form.[3] (ECF Nos. 38, 38-1, at 1-2.)

## I. SUMMARY-JUDGMENT STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] mere factual dispute will not preclude summary judgment; instead there must be a genuine issue of material fact." *Cooperman v. David*, 214 F.3d 1162, 1164 (10th Cir. 2000). The Court "look[s] at the factual record and the reasonable inferences to be drawn from the record in the light most favorable to the non-moving party." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006).

---

[3] Plaintiff also included with the FAC a document entitled, "Attachment # 3," upon which he handwrote a list under the heading, "Food Criteria," and a second list under the heading, "Scriptural References." (ECF No. 38-22.) This document does not comply with the Federal Rule of Civil Procedure 56 and District of Utah Local Civil Rule 56-1, both of which were attached to the Court's October 13, 2020 Order Regarding Service of Process. (ECF No. 43, at 9-11.) In that Order, the Court stated, "For Plaintiff's information and convenience, the Court has attached the procedural rules governing summary-judgment practice." (*Id.* at 7.)

Rule 56 reads in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

Plaintiff's "Attachment # 3" does not meet the relevant criteria for it to qualify as evidence in this summary-judgment proceeding; it is therefore disregarded. (ECF No. 38-22.)

"Once the moving party has identified a lack of a genuine issue of material fact, the nonmoving party has the burden to cite to specific facts showing that there is a genuine issue for trial." *May v. Segovia*, 929 F.3d 1223, 1234 (10th Cir. 2019) (internal quotation marks omitted). "Those specific facts must be supported by particular parts of materials in the record; relying on mere pleadings is insufficient." *Id.* (citation and internal quotation marks omitted). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Self*, 439 F.3d at 1230 (internal quotation marks omitted.).

## II. BCJ DEFENDANT MESSINGER

Defendant Messenger's summary-judgment motion is granted on the sole dispositive ground of his affirmative defense of Plaintiff's failure to exhaust his administrative remedies.

### A. UNDISPUTED MATERIAL FACTS

1. Plaintiff participated in the Inmate Placement Program, which is "a State program that sends eligible inmates to counties that have contracted with the State to provide jail housing." (Messenger Decl., ECF No. 102, at 3.)

2. On May 11, 2018, P arrived at BCJ. (BCJ Inmate Grievance Form, ECF No. 38-1, at 1.) "In booking, Plaintiff talked to Defendant Messenger regarding religious access," specifying he required "religious services and meals adhering to the Hindu faith." (ECF No. 38, at 2.) "Plaintiff provided information on Hindu religious meals, at which time [Messenger] declined to look at or verify." (ECF No. 38, at 2.) Plaintiff continually requested religious meals, adhering to the Hindu religion, but was denied by [Messenger]." (*Id.*) "Once [Plaintiff] requested a diet in

4

accordance with Hindu practices, [Messinger] approved his dietary request and began researching dietary accommodations to assist . . . kitchen staff." (ECF No. 102, at 2.)[4]

4. At the relevant time, Defendant Messinger was a BCJ housing sergeant, whose work duties "included approving religious diets, approving and scheduling religious volunteers, and answering Level Two Grievances." (Fails Decl., ECF 90-2, at 1; ECF No. 102, at 2.)

5. At the relevant time, BCJ had a three-level "comprehensive grievance system where any inmate can grieve any aspect of their incarceration." (ECF Nos. 90-2, at 2; 102, at 2.) "A copy of the grievance [policy] is . . . in the inmate handbook that is given to all prisoners at booking." (ECF No. 90-2, at 2.) "New inmates shall receive orientation on the grievance procedure upon arrival at the facility." (BCJ Inmate Grievance Policy, ECF No. 90-5, at 2.) "Grievance forms shall be made available to inmates." (*Id.*) "If the inmate is unsatisfied with the staff response [to the inmate's level-one grievance], he/she will have five (5) calendar days to complete [the level-two grievance form] and submit the form to the Jail Sergeant via the facility mail system." (BCJ Grievance Written Policy and Procedure, ECF No. 90-4, at 3; ECF No. 90-5, at 4.)

23. On May 29, 2018, Plaintiff filed two level-one grievances, one on a "Department of Corrections" form and one on a BCJ form. (ECF No. 102-1, at 1-4.) On the UDOC form, Plaintiff stated,

> On 5/16/18, I talked to Sgt. Messinger regarding the other tenets to be followed as per Hindu religion. Sgt. Messinger said he would forward the information to the culinary. Sgt. Messinger was also

---

[4] This paragraph presents a dispute of a material fact; however, the claims against Defendant Messinger are dismissed on the basis of his affirmative defense of Plaintiff's failure to exhaust his administrative remedies. So the dispute is immaterial.

> aware of as well as the culinary staff, that I am not receiving
> proper protein. I am receiving less protein.

(*Id.* at 1.) On the BCJ form, Plaintiff's statement was similar to the UDOC form. (*Id.* at 3.)

26. On June 6, 2018, BCJ's grievance officer issued a decision about P's May 29, 2018

grievance, in which the officer stated, "[W]e only shall reasonably accommodate the practice of

Hindu religion. . . . [Lack of] Hindu services . . . at the facility . . . [is] from a dearth of religious

leadership in the area and not caused by any rule or regulation imposed by the jail." (ECF No.

102-1, at 4.) The officer quoted BCJ's "Policy & Procedures Code[] J06.03.03 RELIGIOUS

DIETS," which states,

> Reasonable accommodation should be made to meet prisoners'
> needs to conform with religious dietary laws. Inmates who request
> special religious diets should not be permitted to dictate specific
> menu items; however, jail officials should develop, and maintain
> on file until needed, special pork-free and vegetarian diets. There
> are many protein sources other than meat (i.e., peanut butter,
> legumes, eggs, cheese, soy products).

(*Id.*) The officer concluded that "reasonable accommodations have been made for [Plaintiff's]

religious diet." (*Id.*)

Also on June 6, 2018, P left BCJ. (ECF No. 90-2, at 1-2.) Plaintiff did not file a level-two

grievance and therefore "did not exhaust his administrative remedies available to him at the

[BCJ] relating to any of the issues raised in his complaint against Beaver County or Sgt. Mark

Messinger." (ECF No. 90-2, at 3.) There is no record of the outcome of, or any further activity

regarding, the simultaneous UDOC grievance from May 29, 2018.

### B. LEGAL STANDARDS OF ADMINISTRATIVE EXHAUSTION

In enacting the Prison Litigation Reform Act of 1995 (PLRA), Congress "impos[ed] a

strict administrative-exhaustion requirement . . . [on] civil-rights claims filed by prisoners."

*Pakdel v. City and Cnty. of San Francisco*, 141 S. Ct. 2226, 2231 (2021) (per curiam) (citing 42 U.S.C.S. § 1997e(a) (2022)). That section states, "No action shall be brought with respect to prison conditions under [42 U.S.C.S. § 1983 (2022)], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C.S. § 1997e(a) (2022). The Supreme Court has often emphasized, "[T]hat language is 'mandatory.'" *Ross v. Blake*, 578 U.S. 632, 638 (2016) ("An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies.") (citing *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) ("Exhaustion is no longer left to the discretion of the district court.")); *Gray v. Sorrels*, 818 F. App'x 787, 791 (10th Cir. 2020) (unpublished) ("[T]he district court is not authorized to dispense with [the statutory exhaustion requirement]."). "There is no question that . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) ("All agree that no unexhausted claim may be considered."). Indeed, PLRA "requires compliance with 'deadlines and other critical procedural rules,' *Woodford*, 548 U.S. at 90-91, with no exceptions for 'special circumstances.'" *Ramirez v. Collier*, 142 S. Ct. 1264, 1275 (2022); *see Ross*, 578 U.S. at 639 ("PLRA's text suggests no limits on an inmate's obligation to exhaust--irrespective of any 'special circumstances.'"); *Miller v. French*, 530 U.S. 327, 337 (2000) ("The mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion."); *see also McNeil v. United States*, 508 U.S. 106, 111 (1993) (stating "we are not free to rewrite the statutory text" when Congress has strictly barred "claimants from bringing suit in federal court until they have exhausted their administrative remedies").

The Supreme Court has held that the PLRA requires "proper exhaustion." *Woodford*, 548 U.S. at 90. "Proper exhaustion" intends use of "'all steps the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Id.* (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis in original). Indeed, the "rules are defined not by PLRA, but by the prison grievance process itself." *Jones*, 549 U.S. at 218; *see also Little v. Jones*, 607 F.3d 1245, 1249 (10th Cir. 2010) ("Because the prison's procedural requirements define the steps necessary for exhaustion, an inmate may only exhaust by properly following all of the steps laid out in the prison system's grievance procedure." (Citation omitted.)). The Supreme Court concedes this requirement will stymie some prisoner cases, but observes that a "centerpiece of the PLRA's effort 'to reduce the quantity . . . of prisoner suits' is an 'invigorated' exhaustion provision, § 1997e(a)." *Woodford*, 548 U.S. at 84, 103 (quoting *Porter v. Nussle*, 534 U.S. 516, 524 (2002)); *see also id.* at 103 (responding to argument "that requiring proper exhaustion is harsh for prisoners, who generally are untrained in the law and are often poorly educated," Supreme Court notes "that prisoners who litigate in federal court generally proceed *pro se* and are forced to comply with numerous unforgiving deadlines and other procedural requirements").

An inmate's failure to exhaust is an affirmative defense, *Jones,* 549 U.S. at 216, and the burden is on the defendant to prove the failure to exhaust, *Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007). But, "[w]hen a defendant has established that an inmate did not exhaust his or her administrative remedies, the burden then shifts to the plaintiff to establish the grievance process was unavailable." *May*, 929 F.3d at 1234.

Indeed, "PLRA contains its own, textual exception to mandatory exhaustion." *Ross*, 578

U.S. at 642. Section 1997e(a)'s exhaustion requirement depends on an administrative remedy's

availability. *See id.* As explained by the Supreme Court, that means "an inmate is required to

exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief

for the action complained of.'" *Id.* (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). The

Court further identified three situations "in which an administrative remedy, although officially

on the books, is not capable of use to obtain relief." *Id.* at 643. Those are: (1) "[W]hen (despite

what regulations or guidance materials may promise) [the administrative procedure] operates as a

simple dead end--with officers unable or consistently unwilling to provide any relief to aggrieved

inmates." *Id.* (2) "[A]n administrative scheme might be so opaque that it becomes, practically

speaking, incapable of use"--i.e., "some mechanism exists to provide relief, but no ordinary

prisoner can discern or navigate it." *Id.* at 644 (stating "[w]hen an administrative process is

susceptible of multiple reasonable interpretations, Congress has determined that the inmate

should err on the side of exhaustion"). And, (3) "when prison administrators thwart inmates from

taking advantage of a grievance process through machination, misrepresentation, or

intimidation." *Id.*

## C. EXHAUSTION ANALYSIS

With this backdrop of law and facts, the Court concludes that it is undisputed that BCJ

had a "three-level . . . grievance system." (ECF Nos. 90-2, at 2; 102, at 2.) So, general principles

dictate that Plaintiff was required to complete all three levels, as available, before bringing this

federal civil-rights action.

The evidence shows that Plaintiff filed only level-one grievances at BCJ: On May 29, 2018, Plaintiff filed two level-one grievances. (ECF No. 102-1, at 1-4.) Plaintiff did not file a level-two grievance and therefore "did not exhaust his administrative remedies available to him at the [BCJ] relating to any of the issues raised in his complaint against . . . Messinger." (ECF No. 90-2, at 3.)

Plaintiff offers no arguments or evidence to contest the evidence showing that he did not exhaust the BCJ grievance process. So, Defendant Messinger has met his burden of showing Plaintiff's failure to exhaust administrative remedies. That shifts the burden to Plaintiff, who argues the grievance process was unavailable to him (with his allegations possibly fitting under only the last of the three scenarios identified by the Supreme Court--"when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation"). *See Ross*, 578 U.S. at 643-44.

Plaintiff argues the grievance process became unavailable to him because on the same day that BCJ's grievance officer decided Plaintiff's May 29, 2018 level-one grievance, with the officer concluding that "reasonable accommodations have been made for [Plaintiff's] religious diet," (ECF No. 102-1, at 4), Plaintiff was moved from BCJ, (ECF No. 90-2, at 1-2). Without evidentiary support, Plaintiff asserts the move was retaliatory "to ensure that he could not complete the grievance process." (Pl.'s *Martinez* Report Resp., ECF No. 94, at 2.) And without citing legal authority, Plaintiff avers the retaliatory move "nullif[ied] the need to appeal his level one grievance." (*Id.* at 3.) Plaintiff's cursory argument on this point concludes with the

unsubstantiated statement that he "did not and could not file a level two or three grievance, once he was moved from Beaver County." (Pl.'s Opp. to Defs.' Summ. J. Mot, ECF No. 108, at 2.)[5]

Plaintiff's approach fatally ignores Rule 56's requirement that "[a] party asserting . . . a fact . . . must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); *see also* DUCivR 56-1(c)(4) ("If additional material facts are relevant . . ., the party must state each additional fact and cite with particularity to the Appendix that contains the supporting evidence."). Though he was required to do so, Plaintiff does not support with admissible evidence his allegations of grievance-process unavailability. (ECF Nos. 94, 108.) Meanwhile, Plaintiff does not dispute that he was aware of the grievance process; after all, he was using the process throughout the alleged events at the heart of this summary-judgment motion.

For another thing, Plaintiff gives no insight or timeline as to when he received the level-one-grievance denial, vis-à-vis when he left the facility; perhaps there was time in between those two events during which he could have filed a level-two grievance. He does not acknowledge that he could have tried to arrange to finish the grievance process by mail or perhaps with his new facility's help. He does not address the fact that he had two level-one grievances on different tracks, one with UDOC that may have been easy to further pursue, based on where he landed

---

[5] Inexplicably, Plaintiff also generally argues that the FAC "is sufficient and rests on its contents alone"; and "[t]he court may not look to the *Martinez* report, or any other pleading outside the complaint itself." (ECF No. 108, at 4.) Meanwhile, the Court actually ordered Defendants to file a *Martinez* report and summary-judgment motion, as they were needed to pierce the FAC's allegations. (ECF No. 43.)

after BCJ. But, most crucially, he offers *no evidence* about the timeline for any efforts or arrangements he could have made to complete the grievance process after leaving BCJ. Based on his lack of evidentiary materials, there is no way to know whether Plaintiff was completely precluded him from finishing BCJ's grievance process. *See Jones*, 549 U.S. at 218 ("[I]t is the prison requirements, and not the PLRA, that define the boundaries of proper exhaustion.").

And, by admitting he never tried to file a level-two or level-three grievance about this situation, Plaintiff concedes he also did not test whether a late grievance would have been accepted and excused under these circumstances. He did even not check to see whether the grievance process was available. *See Ross v. Cnty. of Bernalillo*, 365 F.3d 1181, 1186 (10th Cir. 2004) ("If a prison accepts a belated filing, and considers it on the merits, that step makes the filing proper for purposes of state law and avoids exhaustion, default, and timeliness hurdles in federal court." (citing *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002))); *see also Ross*, 578 U.S. at 644 (stating "[w]hen an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion"); *Woodford*, 548 U.S. at 95 ("A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction."); *cf. Porter*, 534 U.S. at 524 ("Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." (citing *Booth*, 532 U.S. at 741)); *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) ("Even where the 'available' remedies would appear to be futile at providing the kind of remedy sought, the prisoner must exhaust the administrative remedies available."). By not trying to submit a delayed grievance, Plaintiff impermissibly speculated that such a grievance

12

would not have been accepted in this situation. *Cf. Woodford*, 548 U.S. at 102 ("Respondent contends that requiring proper exhaustion will lead prison administrators to devise procedural requirements that are designed to trap unwary prisoners and thus to defeat their claims. Respondent does not contend, however, that anything like this occurred in his case, and it is speculative that this will occur in the future.").

Meanwhile, case law supports the concept that inmates are not necessarily excused from exhaustion requirements, though they change facilities. *See Brewer v. Gilroy*, 625 F. App'x 827, 832 (10th Cir. 2015) (unpublished) (concluding, though Plaintiff alleged conspiracy to transfer him to keep him from filing action, Plaintiff pointed to nothing about transfer convincing court that administrative remedies were unavailable); *Allen v. 1998 Chief Med. Officer*, 211 F. App'x 791, 793 (10th Cir. 2007) (unpublished) (disagreeing with Plaintiff's argument "that his transfer to a new prison . . . prevented him from complying with the . . . grievance process," noting no futility exception in PLRA's exhaustion requirement); *Gonyea v. Mink*, 206 F. App'x 745, 747 (10th Cir. 2006) (unpublished) (rejecting inmate's claim that grievance process was unavailable when he could have filed grievance against county prison after transferring to county jail); *Patel v. Fleming*, 415 F.3d 1105, 1111 (10th Cir. 2005) (holding prisoner failed to exhaust administrative remedies when, after transfer to different facility, he did not timely file grievance); *Johnson v. Wackenhut Corr. Corp.*, 130 F. App'x 947, 950 (10th Cir. 2005) (unpublished) ("There is . . . no evidence that plaintiff ever attempted to file an untimely grievance form, either upon his release from the medical unit or protective custody or upon his transfer to a different prison . . . ."); *Jones v. Barry*, No. 03-2301, 2005 U.S. App. LEXIS 2180, at *8 (10th Cir. Feb. 10, 2005) (unpublished) ("Mr. Jones contends that this transfer from the

Torrance prison to the prison in Virginia excuses him from having to fully exhaust these claims. We cannot agree."); *Turrietta v. Barreras*, 91 F. App'x 640, 642 (10th Cir. 2004) (unpublished) (stating "mere fact that [inmate] was transferred and confined does not direct the conclusion that he was thereby prevented from filing a grievance"); *Kiro v. Moore*, No. CIV 03-1223 JB/ACT, 2005 U.S. Dist. LEXIS 13596, at *15 n. 4 (D.N.M. Apr. 29, 2005) ("[T]he Court finds that, even though Kiro is incarcerated at a different facility than the one in which the alleged incident occurred, he must still exhaust administrative remedies before filing a lawsuit.").

None of this is to say that Plaintiff could not have possibly alleged sufficient facts to successfully support an argument that officials made the opportunity to grieve unavailable, based on specific details about this particular transfer--just that his flat general statement that a transfer nullifies the grievance requirement is wrong. And that was essentially his whole argument.

In short, the exhaustion requirement's relentless applicability to all inmates filing conditions-of-confinement claims necessarily dashes Plaintiff's argument granting himself license to dodge it. He is simply incapable of choosing to bypass the identified benefits of exhaustion, which "include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219 (citing *Woodford*, 548 U.S. at 88-91; *Porter*, 534 U.S. at 524-525).

The Court therefore grants summary judgment for Defendant Messinger.

### III. UCJ DEFENDANT SCHILTZ

Plaintiff asserts Defendant Schiltz violated his (1) First Amendment right to free exercise of his Hindu religion by denying his request for religious access--e.g., dietary requirements, possession of religious items, and religious services; and, (2) Fourteenth Amendment rights to due process and equal protection, when she did "not treat[ him] equally [to Jewish and Muslim inmates] in regards to religious meals." (ECF No. 38, at 19.)

Defendant Schiltz's dispositive argument is her entitlement to qualified immunity; in other words, she contends she did not violate Plaintiff's clearly established constitutional rights. (ECF No. 101, at 2.) She has (again) provided the following evidentiary support for her position: affidavits, jail records and grievance policies, and copies of Plaintiff's requests and grievances, and jail responses to those requests and grievances. (ECF Nos. 90; 101; 103-04.) The Court concludes Schiltz's qualified-immunity defense shields her from further litigation here.

Emphasizing that all the evidentiary support needed for his arguments is contained in the FAC, (ECF No. 108, at 4), Plaintiff's whole response to Defendant Schiltz's argument is as follows:

(a) "Defendant Schiltz . . . [a]pproved Plaintiff's dietary request. Summary Judgment, p. 8, # 29. Defendant approved the removal of meat, fish and eggs from Plaintiff's diet. All other religious tenets were not followed." (*Id.* at 2.) Specifically, "[a]ll other food preparation criteria was ignored. Even though Plaintiff provided [Defendant] some of the criteria that must be adhered to[,] . . . criteria as required by Hindu scriptures." (*Id.* at 3.)

(b) UCJ provided "Jewish and Muslim inmates . . . Kosher and Halal meals. Plaintiff was denied religious meals solely based on that he is a practicing Hindu[, which as a r]eligion is a

15

protected class[, so] Defendant[] substantially burdened Plaintiff's sincerely-held religious belief." (*Id.*)

(c) "It is undisputed that a prisoner has a clearly established right to a diet consistent with his religious scruples. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1212-13 (10th Cir. 1999)." (*Id.* at 2.)

(d) "Qualified immunity is unavailable because accommodation of a prisoner's religious diet is a clearly established right. *Makin v. Colo. Dep't of Corr., supra*." (*Id.*)

## A. QUALIFIED-IMMUNITY STANDARD

"When a § 1983 defendant raises the qualified immunity defense, the burden shifts to the plaintiff." *Sawyers*, 962 F.3d at 1282. "To overcome qualified immunity, a plaintiff must show (1) facts that demonstrate the officials violated a federal constitutional or statutory right, which (2) was clearly established at the time of the defendant's conduct." *Id.* The two prongs of qualified immunity may be addressed in either order; "if the plaintiff fails to establish either prong of the two-pronged qualified immunity standard, the defendant prevails on the defense." *Spencer v. Abbott*, 731 F. App'x 731, 740 (10th Cir. 2017) (unpublished) (quoting *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015)); *see Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) ("In short, although we will review the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." (citation omitted)).

Defendant fails to meet his burden as to prong one; the Court therefore need not address prong two.

### B. MATERIAL FACTS

1. On March 11, 2019, Plaintiff arrived at UCJ. (ECF No. 90-3, at 1-2; UCJ Inmate

Booking History, ECF No. 90-9, at 3.)

2. At the relevant time, Defendant Schiltz was a UCJ sergeant, with work duties

including "staff discipline, answering Level Two Grievances, and programming." (Schiltz Decl.,

ECF No. 104, at 1.) "Programming included approving, training and scheduling volunteers as

well as approving religious diets and religious item purchases from outside vendors." (*Id.*) "Upon

approval of the religious diet for the Plaintiff, the culinary staff is sent notice of the approved

dietary change." (*Id.* at 3.) UCJ

> contracts with a company who provides the Jail's culinary staff.
> Upon receiving notice of an inmate's dietary change, the culinary
> staff coordinated with their company's Registered Dietitian for
> meal-planning. [Schiltz] had no reason to believe the culinary staff
> would not attempt to accommodate reasonable requests related to a
> religious diet. [Schiltz] had no decision making over the content of
> individual inmate diets or meals. [Schiltz] did not personally serve
> a meal to Plaintiff.

(*Id.*)

3. "[F]rom March through July of 2019," Plaintiff wrote Schiltz "numerous times, in

regards to religious meals, religious services and religious items. . . . [Schiltz] stated that all of

the religious access issues were resolved. However, none of the issues were resolved. [Schiltz]

made no attempt to provide any remedy to Plaintiff." (ECF No. 38, at 16.)

4. On March 29, 2019, Plaintiff wrote a letter to Defendant Schiltz, regarding "religious

access for practicing Hindus." (ECF No. 90-9, at 15.) Plaintiff stated, "I have been [at UCJ] for

close to a month and I have yet to receive religious access," such as proper religious meals and

items. (*Id.*) Schiltz responded that Plaintiff's concerns "have all been addressed in [Plaintiff's] grievances and/or GRAMA requests or [Plaintiff] has been seen by the stat PA." (*Id.* at 16.)

5. On April 17, 2019, Plaintiff wrote a letter to Defendant Schiltz, stating that he had placed a request with Schiltz on March 26 for Hindu meals and religious items, but had "not heard back from [Schiltz] yet." (*Id.* at 9.) Schiltz responded that Plaintiff could take the religious courses he requested and could possess certain religious books, so long as he complied with UCJ's policy for possession of books. (*Id.* at 10.)

6. On April 18, 2019, Plaintiff filed a level-two grievance appeal as to UCJ's "unsatisfactory" response to his March 16, 2019 level-one grievance, and stating his religious-access issues were not resolved, and he had sent "information . . . regarding the food requirement . . . to Sgt. Larson, Sgt. Schiltz, and Lt. Brown." (*Id.* at 103, 152.)

7. On April 28, 2019, Plaintiff wrote a letter to Lt. Brown, stating Plaintiff had "notified [Defendant] Schiltz and Sgt. Larsen regarding the food [Plaintiff] currently receives [that] does not adhere to the Hindu faith." (ECF No. 103-2, at 5.) Plaintiff went on to say that Plaintiff "met with Sgt. Larson [to] discuss[] different options . . . [of food] adher[ing] to [Plaintiff's] religious practices." (*Id.*) Plaintiff further told Lt. Brown that he expected Brown and UCJ staff members to meet various demands for Plaintiff's food and how it must be served. (*Id.*)

8. On May 1, 2019, Plaintiff submitted "Request # 047032283," entitled "Religious access," and stating, "Food, alter [sic], correspondence course, religious observances. I receive none of these access under federal law." (ECF No. 90-13, at 3.)

9. On May 3, 2019, UCJ Commander Brown wrote Plaintiff a letter saying that UCJ would continue the policy of ensuring him a feast meal on Mondays only. (ECF No. 103-2, at 4.)

10. On May 8, 2019, Plaintiff wrote a letter to "Culinary Staff," stating staff had not been giving him properly compliant Hindu meals. (ECF No. 90-9, at 13.) The culinary staff manager replied, "I follow the menu our registered dietitian supplies me for a vegetarian diet." (*Id.* at 14.)

11. On May 13, 2019, Plaintiff filed a level-two grievance, challenging denial of a remedy for his March 29, 2019 level-one grievance, as to his assertion that he was denied equal protection because he was treated dissimilarly to other inmates in his same classification--e.g., his "religious items were taken." (ECF No. 103-2, at 66.)

12. On May 14, 2019, Plaintiff filed a level-one grievance, alleging denial of equal protection because he did not receive the same privileges--i.e., as to legal documents and religious items--as others classified the same as him. (ECF No. 90-9, at 65, 191.)

13. On June 4, 2019, a UCJ grievance officer denied Plaintiff's May 14, 2019 grievance, with the officer stating that Plaintiff is treated the same as others inmates in his same classification, and the legal documents and religious items that Plaintiff asserts were taken from him were never brought into UCJ in the first place. (*Id.* at 66, 191-92.)

Also on June 4, 2019, Plaintiff filed a level-three grievance about events on March 11, 2019--the day he arrived at UCJ and first told staff that he required religious accommodations-- and about which he filed a level-one grievance on March 16, 2019. (*Id.* at 147, 180.) This level-three grievance stated he had not received religious meals, services, and items he was entitled to. (*Id.*) He further stated, "[Defendant] Schiltz does not respond to my letters and Lt. Brown ignores my letters as well. Lt. Brown stated in her letter to me dated 4/5/19 that I could have my religious items from Gunnison. Yet, I have not received my religious items." (*Id.*)

14. On June 8, 2019, Defendant Schiltz responded to Plaintiff's May 1, 2019 "Request # 047032283," with Schiltz stating, "Sgt. Tucker has already spoken with you several times about these things. We don't have the property you are looking for; the prison still has it. You can order things from commissary to make your alter [sic] and you are already getting your fast and feast meals." (ECF No. 90-13, at 3.)

15. On June 22, 2019, UCJ grievance officer, Defendant Schiltz, denied Plaintiff's level-two grievance. (ECF Nos. 90-9, at 101, 150; 103, at 3.) Schiltz "confirmed that the Plaintiff was approved for a religious diet while in [UCJ]." (ECF Nos. 104, at 2; 104-1, at 2.) Schiltz explained UCJ had not responded to Plaintiff's March 22, 2019 level-one grievance because it had more than one topic and was repetitive of other grievances also about equal religious access. (ECF Nos. 90-9, at 101, 150; 103, at 3.)

16. On June 24, 2019, Plaintiff submitted "Request # 053039823," entitled, "Religious access," and stating,

> Sgt. Tucker has never talked to me about religious access. That is a lie. Second, your commissary does not have what I need. Third I do not receive religious meals nor fast meals. Another lie. I want all my requests I sent to you on here and your responses printed for to send to the court.

(ECF No. 90-13, at 2.)

17. On June 27, 2019, Defendant Schiltz responded to Plaintiff's June 24, 2019 "Request # 053039823," stating,

> Sgt. Tucker has at the very least talked to you about your altar items/property that you want; which are not here and the prison will not send here. Commander Brown has said that you won't be approved for items not on the commissary; you can definitely order a towel and a bowl. You are receiving feast and fast meals. Commander Brown has talked to the kitchen about your once a

> week fast meal and you are approved for all of the feast days that
> are approved through the Prison for Hindu feast days. If you aren't
> talking about the altar or meals, then I don't know what access you
> are referring to that you think is being denied to you. You will
> have to formally G.R.A.M.A. request the requests/responses from
> on here in order to get them.

(*Id.*)

18. On August 30, 2019, P left UCJ. (ECF Nos. 90-3, at 1-2; 90-9, at 3.)

### C. QUALIFIED-IMMUNITY ANALYSIS

Under qualified-immunity's first prong, Plaintiff's is burdened with showing that

Defendant Schiltz breached his federal constitutional rights to free exercise and equal protection.

### 1. FREE-EXERCISE TENETS

"The Free Exercise Clause of the First Amendment, applicable to the States under

the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free

exercise" of religion." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021). "The free

exercise of religion means, first and foremost, the right to believe and profess whatever religious

doctrine one desires." *Emp. Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990).

So, the First Amendment clearly bars all "governmental regulation of religious *beliefs* as

such." *Sherbert* v. *Verner*, 374 U.S. 398, 402 (1963). The government may not forcibly affirm a

religious belief, *see Torcaso* v. *Watkins*, 367 U.S. 488 (1961), penalize the observance of

religious tenets it thinks to be incorrect, *United States* v. *Ballard*, 322 U.S. 78, 86-88 (1944),

inflict specific disadvantages based on religious viewpoints or position, *see McDaniel* v. *Paty*,

435 U.S. 618 (1978); or tip the scales for one side or the other in conflicts over religious

authority or principles, *see Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian

Church*, 393 U.S. 440, 445-452 (1969).

21

The Supreme Court's free-exercise case law mainly addresses laws burdening religious exercise. For instance, a "neutral," "generally applicable" law is constitutional if "rationally related to a legitimate government interest." *Brown v. Buhman*, 822 F.3d 1151, 1160 n.5 (10th Cir. 2016); *see Smith*, 494 U.S. at 877-79. Meanwhile, a law lacking neutrality or general applicability is unconstitutional unless "narrowly tailored to advance" "a compelling government interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah* (*Lukumi*), 508 U.S. 520, 531 (1993); *see Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam).

This case is not about law burdening religion, but rather a jail sergeant allegedly unwilling to ensure Plaintiff had proper religious access, including meals meeting Hindu dietary criteria. This involves executive action, and "the First Amendment applies to exercises of executive authority no less than it does to the passage of legislation." *Shrum v. City of Coweta*, 449 F.3d 1132, 1140 (10th Cir. 2006); *see Sause v. Bauer*, 138 S. Ct. 2561, 2562-63 (2018) (concluding police officers ordering person to stop praying may have violated free-exercise rights); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1293-99 (10th Cir. 2004) (reviewing executive action under Free Exercise Clause). The Tenth Circuit has further held that executive action "motivated by [the plaintiff's] religious commitments" is "not neutral" and is "a violation of his clearly established constitutional rights under the Free Exercise Clause," even if not "motivated by overt religious hostility or prejudice" or "animus." *Shrum*, 449 F.3d at 1144-45 (quotations omitted); *see Janny v. Gamez*, 8 F.4th 883, 912 (10th Cir. 2021) (concluding plaintiff sufficiently averred free-exercise violation based on "non-neutral coercion or compulsion" by executive actor not motivated by animus).

### 2. FREE-EXERCISE TENETS APPLIED TO MATERIAL FACTS

First, Plaintiff's summary-judgment response states," Schiltz . . . [a]pproved Plaintiff's dietary request. Summary Judgment, p. 8, # 29. Defendant approved the removal of meat, fish and eggs from Plaintiff's diet. All other religious tenets were not followed." (ECF No. 108, at 2.) Specifically, "[a]ll other food preparation criteria was ignored. Even though Plaintiff provided [Defendant] some of the criteria that must be adhered to[,] . . . criteria as required by Hindu scriptures." (*Id.* at 3.) So, Plaintiff concedes that Schiltz approved his religious dietary request, which fulfilled her limited role in facilitating his ability to freely exercise his religion. With that concession, it is really the execution of his request that he attacks now.

But it is undisputed that, once Schiltz approved the provision of meals meeting Hindu dietary requirements, she was not affirmatively linked to the acts required to carry out the request or the failures to act to carry out the request. linked to the request's execution. *See Gallagher v. Shelton*, 587 F.3d 1063, 1069 (2009) ("'Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation.'" (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997))). "Programming included approving, training and scheduling volunteers as well as approving religious diets and religious item purchases from outside vendors." (*Id.*) Indeed, "[u]pon approval of the religious diet for the Plaintiff, the culinary staff is sent notice of the approved dietary change." (ECF No. 104, at 3.) And UCF "contracts with a company who provides the Jail's culinary staff," which "coordinated with their company's Registered Dietitian for meal-planning." (*Id.*) Crucially, the undisputed evidence shows that Schiltz "had no decision making over the content of individual inmate diets or meals" and never "personally served a meal to Plaintiff." (*Id.*)

Still, the FAC's allegations attack Schiltz, asserting, "[F]rom March through July of 2019," Plaintiff wrote Schiltz "numerous times, in regards to religious meals, religious services and religious items. . . . [Schiltz] stated that all of the religious access issues were resolved. However, none of the issues were resolved. [Schiltz] made no attempt to provide any remedy to Plaintiff." (ECF No. 38, at 16.) In his verified FAC, Plaintiff swore under penalty of perjury that these allegations are true. (*Id.* at 22.) And a "verified complaint . . . may be treated as an affidavit on summary judgment. *Janny*, 8 F.4th at 899. Even so, "[a]ffidavits must contain certain indicia of reliability. Unsubstantiated allegations carry no probative weight in summary judgment proceedings; they must be based on more than mere speculation, conjecture, or surmise." *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1201 (10th Cir. 2015) (quotations and brackets omitted).

To repeat here, Plaintiff has undercut himself by conceding that "Defendant Schiltz . . . [a]pproved Plaintiff's dietary request." (ECF No. 108, at 2.) But, other contemporaneous records of Schiltz's granting of religious requests further undermine Plaintiff's general, conclusory allegations of her stonewalling in his FAC, which he drafted months later. *See Fontenot v. Crow*, 4 F.4th 982, 1037 (10th Cir 2021) ("In light of this contemporaneous contradictory information, we must discount to some degree the credibility of the information" found in affidavit presented more than two decades after new trial); *Sherman v. Klenke*, 653 F. App'x 580, 585-86 (10th Cir. 2016) (unpublished) ("A nonmovant can properly oppose [SJ] with affidavits [like the complaint], but . . . conclusory and self-serving affidavits are not sufficient."); *Boles v. Dansdill*, 361 F. App'x 15, 18 (10th Cir. 2010) (unpublished) (stating "conclusory and self-serving affidavits" do not serve as "objective evidence" upon which SJ may be based);

24

*States Bureau of Prisons*, 282 F. App'x 701, 704 (10th Cir. 2008) (unpublished) (relying on contemporaneous medical records over "conclusory and self-serving statements" in Plaintiff's affidavit); *Cahill v. Nye*, No. 99-3059, 2000 U.S. App LEXIS 2481, at *3-4 (10th Cir. Feb. 17, 2000) (unpublished) ("When 'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986))); *Oates v. Englund*, No. 99-1187, 1999 U.S. App. LEXIS 24645, at *3 (10th Cir. Oct. 4, 1999) (unpublished) (stating, when plaintiff "has offered nothing to support his conclusory and self-serving allegation," plaintiff's affidavit is "not sufficient to create a genuine issue of fact"). For instance, Schiltz responded to Plaintiff's April 17, 2019 letter, asking for religious, that he could take the religious courses he requested and could possess certain religious books, so long as he complied with UCJ's book-possession policy. (ECF No. 90-9, at 9-10.) And, on June 8, 2019, Schiltz answered Plaintiff's May 1, 2019 "Request # 047032293," with Schiltz stating, "You can order things from the commissary to make your alter [sic] and you are already getting your fast and feast meals." (ECF No. 90-13, at 3.) Also, on June 22, 2019, Schiltz confirmed "Plaintiff was approved for a religious diet while in [UCJ]." (ECF Nos. 104, at 2; 104-1, at 2.) Finally, on June 27, 2019, Schiltz responded to Plaintiff's June 24, 2019 "Request # 053039823," stating to Plaintiff,

> [Y]ou can definitely order a towel and a bowl. You are receiving feast and fast meals. Commander Brown has talked to the kitchen about your once a week fast meal and you are approved for all of the feast days that are approved through the Prison for Hindu feast days.

(ECF No. 90-13, at 2.) These bits of contemporaneous evidence overcome Plaintiff's bald assertion that Schiltz "made no attempt to provide any remedy to Plaintiff."

Further, Plaintiff faults Defendant Schiltz for not ensuring that "[a]ll other religious tenets were . . . followed . . . [in] food preparation[] . . . even though Plaintiff provided [Defendant] some of the criteria that must be adhered to . . . as required by Hindu scriptures." (ECF No. 108, at 2-3.) But, in this summary-judgment proceeding, he has not brought the Court admissible evidence of what criteria he may have given Defendant Schiltz from Hindu scriptures to guide preparation of meals for a practitioner of the Hinduism. So--even if Schiltz had any responsibility to execute his Hindu meals--Plaintiff has not equipped the Court with any evidence from which to conclude that his approved Hindu diet was not adequately carried out. executed.

Additionally, several of Schiltz's interactions with Plaintiff were limited to her answering or denying Plaintiff's grievances and requests, in which he sought action by other UCJ staff members. However, "a denial of a grievance, but itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983." *Gallagher*, 587 F.3d at 1069. For instance, on March 29, 2019, Plaintiff wrote a letter to Defendant Schiltz, regarding "religious access for practicing Hindus." (*Id.* at 15.) Plaintiff stated, "I have been [at UCJ] for close to a month and I have yet to receive religious access," such as proper religious meals and items. (*Id.*) Schiltz responded that Plaintiff's concerns "have all been addressed in [Plaintiff's] grievances and/or GRAMA requests or [Plaintiff] has been seen by the stat PA." (*Id.* at 16.) And Schiltz responded to another one of Plaintiff's requests for religious items and meals, stating, "You can order things from commissary to make your alter [sic] and you are already getting your fast and feast meals." (ECF No. 90-13, at 3.) But her answers to

grievances and requests alone could not have violated his constitutional rights. Her answers did not equate to her personal participation in alleged deprivations.

Finally, many other UCJ staff members who are not defendants at this point are mentioned in Plaintiff's materials as allegedly involved in an overall failure to provide religious items and meals. Schiltz was but one cog in the wheel. But the liability of any other staff member is not at issue here. So the only thing that matters is that Plaintiff has not adequately carried his burden, with admissible evidence, to show that *Schiltz* violated his federal constitutional right to religious access.

### 3. EQUAL-PROTECTION CLAIM

Here, Plaintiff contends the following: UCJ provided "Jewish and Muslim inmates . . . Kosher and Halal meals. Plaintiff was denied religious meals solely based on that he is a practicing Hindu[, which as a r]eligion is a protected class[, so] Defendant[] substantially burdened Plaintiff's sincerely-held religious belief." (*Id.*) Except to bluntly state, without support, that Defendant Schiltz violated his right to equal protection, Plaintiff has not affirmatively linked Schiltz to this claim by asserting specific allegations of Schiltz's behavior. Plaintiff thus fais to carry his burden on qualified immunity as to this claim against Schiltz.

### D. SCHILTZ SUMMARY

As Plaintiff has not met his qualified-immunity burden of supplying evidence of material facts supporting his accusations that Defendant Schiltz breached his federal constitutional rights, Schiltz is protected from further litigation in this matter.

## IV. CONCLUSION

**IT IS ORDERED** that:

**(1)** Because Plaintiff did not exhaust administrative remedies as to his claims against Defendant Messinger, Messinger's summary-judgment motion is **GRANTED**. (ECF No. 101.) Messinger is thus **DISMISSED** from this action without prejudice.[6]

**(2)** Because Plaintiff has not carried his burden to show Defendant Schiltz violated his constitutional rights, based on her affirmative defense of qualified immunity, Schiltz's summary-judgment motion is **GRANTED**. (ECF No. 101.) Schiltz is thus **DISMISSED** from this action with prejudice.

DATED this _10th_ day of March, 2023.

BY THE COURT:

_____

JUDGE DAVID NUFFER
United States District Court

---

[6] Generally, "courts should . . . dismiss . . . unexhausted claims without prejudice." *Fields v. Okla. State Penitentiary*, 511 F.3d 1109, 1113 (10th Cir. 2007).